UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

MEDEQUA LLC,                                                                Civil Action No.

                                        Plaintiff,

                                                                            **COMPLAINT**

                - against -

BRIAN O'NEILL,

                                        Defendant.
----------------------------------------------------------------X

      Plaintiff Medequa LLC (hereinafter "Medequa" or "Plaintiff"), by and through its attorneys, Condon & Forsyth LLP, for its complaint against Brian O'Neill (hereinafter "O'Neill" or "Defendant"), the founder, sole controlling member, managing partner of O'Neill & Partners, LLC (hereinafter "ONP"), and attorney, alleges as follows:

## I.    <u>NATURE OF THE COMPLAINT</u>

      1.    This action seeks damages arising from O'Neill's fraudulent scheme, where he falsely assured to safeguard $5,100,000.00 held in escrow (the "Escrow Funds") – all during the time O'Neill and ONP served as Escrow Agent for Medequa.  Instead of abiding by his duties as an Escrow Agent, O'Neill exploited his position through his unlawful transfer and disposal of the Escrow Funds for his personal benefit.

      2.    The escrow agreement (the "Escrow Agreement") obligated O'Neill to hold the Escrow Funds in a separate escrow account (the "Escrow Account"), distinct from ONP's personal and business accounts.  Over the course of nearly a year, however, O'Neill intentionally misrepresented and fabricated falsehoods to Medequa regarding the Escrow Funds.  By the time of Medequa's discovery of these falsehoods, O'Neill had dissipated the Escrow Funds to purchase personal protective equipment ("PPE") in furtherance of his own business deals and personal

ambitions.  By his breach of fiduciary duty, fraudulent representations, fraudulent inducement, and fraudulent concealment, and as a direct result of Medequa's trust and justified reliance in him as Escrow Agent, O'Neill caused damages of at least $5,100,000.00 to Medequa, plus attorneys' costs and fees, interest, and exemplary costs.

3.    On July 16, 2021, Plaintiff filed a civil complaint in the United States District Court for the Southern District of New York (the "Court"), captioned *Medequa LLC v. O'Neill & Partners LLC* (1:21-cv-06135-AKH), against ONP.  Medequa alleged that O'Neill, as managing partner and principal of ONP, caused ONP to breach its contractual obligations to Medequa and sought recovery of the Escrow Funds. In November 2021, Medequa moved for partial summary judgment, which the Court granted, holding that O'Neill breached the Escrow Agreement by failing to return the Escrow Funds and by transferring them without Medequa's authorization. *Infra* ¶¶ 56-66.

4.    In *United States of America v. Brian O'Neill* (1:22-cr-00057-VEC-1), the United States Attorney's Office brought a parallel criminal action against O'Neill individually.   In this criminal action, O'Neill pled guilty of committing wire fraud against Medequa in connection with the period he acted as Escrow Agent.  On May 17, 2023, the court entered a criminal judgment (the "Criminal Judgment") against O'Neill, sentencing him to nine years in prison and three years of supervised release.  *Infra* ¶¶ 67-75.  Further, the court ordered O'Neill to pay $9,397,545.01 in restitution to Medequa and other victims after admitting to orchestrating the underlying fraud and the facts contained herein.  *Infra* ¶ 75.

5.    Accordingly, relying on facts incorporated from the Criminal Judgment and the underlying fraud that materialized from the factual allegations herein, Medequa brings this action seeking damages from the previous judgment against O'Neill for the $5,100,000.00 that he

defrauded from Medequa, as well as attorneys' fees, costs, accrued interest permitted by law, and exemplary damages.

## II.   PARTIES

6.      Plaintiff Medequa LLC is a limited liability company with its registered office at 815 Brazos Street, Suite 500, Austin, Texas 78701.  Khaled Otrok, a natural person, is Medequa LLC's sole member, and he is domiciled in Flower Mound, Texas.  Accordingly, Plaintiff is a citizen of the State of Texas.

7.      Brian O'Neill is a natural person who, upon information and belief, is a citizen of the State of Maryland.  Upon information and belief, Defendant Brian O'Neill is incarcerated, currently serving his sentence at Federal Correctional Institution, Cumberland ("FCI Cumberland"), a medium-security federal prison, located at 14601 Burbridge SE, Cumberland, Maryland 21502.  Upon information and belief, O'Neill last resided at 7714 Curtis Street, Chevy Chase, Maryland 20815 before his conviction and incarceration at FCI Cumberland.

## III.   JURISDICTION AND VENUE

8.      This Court has jurisdiction over Defendant in this District.  Plaintiff's causes of action arise of out Defendant's transaction of business in New York (N.Y. CPLR § 302), including his exchanges with Plaintiff's attorneys and later this Court concerning the underlying transaction and transmitting wire of funds into the State of New York along with those representations.   The assertion or jurisdiction over Defendant is fair and reasonable and does not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332, in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum or value of $75,000.00.

9.      Venue is appropriate pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the fraudulent scheme against Medequa LLC occurred in this District.

## IV.    THE FRAUD AGAINST MEDEQUA LLC

10.      Medequa LLC ("Medequa" or "Buyer") and SonerMed LLC ("SonerMed" or "Seller"), a Florida-based medical equipment wholesale company, entered into a Purchase Order to acquire $10,200,000.00 worth of PPE for donation to the Federal Emergency Management Agency (FEMA).  A true and accurate copy of the Purchase Order is attached as **Exhibit 1**.

11.      Under the terms and conditions of the Purchase Order, Medequa contracted to purchase six million 3M N951860 face masks ($1.70/each) from SonerMed and required Medequa as Buyer to deposit $5,100,000.00 in escrow.

**Defendant Obtains Access to Plaintiff's Escrow Funds as Escrow Agent**

12.      Contemporaneously on August 12, 2020, Medequa appointed O'Neill and ONP as the Escrow Agent for this transaction (the "Escrow Agreement").  A true and accurate copy of the Escrow Agreement is attached hereto as **Exhibit 2**.

13.      By the terms of the Escrow Agreement, O'Neill represented in writing that he would hold the Escrow Funds in a "separate and segregated demand deposit account with TD Bank" (the "Escrow Account") ending in account number 4107 for Buyer.

14.      Further, O'Neill represented that he would promptly refund and disburse the Escrow Funds upon certain triggering events, including his receipt of the Buyer's cancellation of the Purchase Order (the "Cancellation Notice"), in accordance with the Escrow Agreement.

15.     In reliance of O'Neill's representations to act in accordance with his duties as Escrow Agent, Medequa deposited the Escrow Funds by wire on August 13, 2020 into the Escrow Account ending in 4107.  A true and accurate copy of the wire transfer is attached as **Exhibit 3**.

16.     After this wire transfer at some time, O'Neill began the unauthorized transfer of the Escrow Funds outside of the Escrow Account to finance personal and business pursuits despite his understanding that these funds were to be separate and segregated.

**Defendant's Intentional and Unauthorized Transfer of Escrow Funds**

17.     By November 13, 2020, the Seller never delivered the PPE.  On November 22, 2020, Medequa issued the Cancellation Notice in writing to Seller and O'Neill, requiring O'Neill to return and disburse the Escrow Funds to Buyer.  A true and accurate copy of the Cancellation Notice is attached as **Exhibit 4**.

18.     O'Neill did not return the Escrow Funds.  Instead, on December 7, 2020, O'Neill falsely misrepresented that there were "irregularities and inconsistent documentation" and he demanded "due diligence" documentation, including but not limited to (i) a "List of Attempted and Failed Procurement [T]ransactions by Soner[M]ed," (ii) the name and contact information for the "U.S. Government Liason [sic]," and (iii) the name of the Beneficial Owner of the [E]scrow [F]unds with supporting identification, to trigger the return the Escrow Funds.  A true and accurate copy of this correspondence is attached as **Exhibit 5**.

19.     O'Neill's assertions were false.  O'Neill offered these misrepresentations to conceal that the full balance of the Escrow Funds no longer remained within the Escrow Account at TD Bank in the accounting ending in 4107.  Moreover, the Escrow Agreement never furnished O'Neill with his purported authority to make such demands, and his bold assertions concerning "irregularities" were unproven and unsupported.  *Id.*

20.     O'Neill, by the time that Medequa issued the Cancellation Notice and had requested disbursement of the Escrow Funds, had already dissipated the Escrow Funds by his unauthorized transfer outside the Escrow Account ending in 4107.  A true and accurate copy of bank account statements for the Escrow Account (4107) are attached as **Exhibit 6**.

21.     On December 9, 2020, Medequa underscored O'Neill's demands exceeded the scope of his position under the Escrow Agreement.  In response to O'Neill's unfounded requests, Medequa noted that the Buyer and Seller reserved the right to mutually terminate the Purchase Order, which proved exactly the case here.  Further, Medequa truthfully represented there had never been a government liaison, that Medequa was the "Beneficial Owner" of the Escrow Funds, and all preconditions to release and return the Escrow Funds had been satisfied under the Escrow Agreement.  A true and accurate copy of December 9 correspondence is attached as **Exhibit 7**.

22.     Despite Medequa's repeated demands and the clear mandate set forth by the Escrow Agreement, O'Neill followed on December 11, 2020.  O'Neill rejected Medequa's responses as "materially deficient," and again refused to return the Escrow Funds.  A true and accurate copy of the December 11 correspondence is attached as **Exhibit 8**.

23.      Specifically, O'Neill characterized his "due diligence" requests as "essential to [ONP's] review of the transaction to ensure that there was no malfeasance or fraud committed by the parties."  *Id.* O'Neill added, "[Medequa's] inaccurate statements and non-production of any documentation is concerning and raises substantial red flags," and that the name of the beneficial owner of the Escrow Funds "is a requirement of State and Federal laws including Anti-money laundering and USA Patriot Act laws and regulations."  *Id.*  O'Neill deceptively cloaked Medequa's truthful representations as "contrary to the information that I have on file."  *Id.*

24.     Despite knowing he lacked any authority and by this time, O'Neill dissipated the Escrow Funds, he added "pursuant to our fiduciary duty to protect the integrity of the transaction and investigate potential malfeasance and fraud that may have been caused the irregularities . . . [we] find the record internally inconsistent, incomplete, and containing material omissions . . . [t]he lack of cooperation with our simple requests for information to close the file is appalling." *Id.* Yet, this entire time, O'Neill had manufactured a tale of fiction and intended Medequa to rely on his falsities acting under his fiduciary duty.

25.     Medequa issued a final demand to O'Neill to comply with the Escrow Agreement and return the Escrow Funds on December 17, 2020.   A true and accurate copy of Medequa's demand is attached as **Exhibit 9**.

26.     To salvage the Escrow Funds, Medequa demanded O'Neill forward documentary proof that the Escrow Funds remained in a segregated account controlled by O'Neill, and to release and wire the Escrow Funds to Medequa again for the final time.  *Id.*, at p.3.

27.     Yet, at all points and times, O'Neill continued to represent explicitly and implicitly that he maintained possession, control, and dominion of Medequa's Escrow Funds and Medequa relied on O'Neill's representations.

**Defendant Persisted His Falsehoods Before the Court and to Plaintiff**

28.     On July 16, 2021, Medequa commenced a civil action (1:21-cv-06135-AKH) (the "Civil Action") before the Court against ONP.   The Civil Action alleged similar factual allegations and claims for breach of contract, breach of fiduciary duty, and conversion therein to recover the Escrow Funds that O'Neill and ONP deprived from Medequa.   A true and correct copy of the complaint is attached as **Exhibit 10**.

29.     Less than a month later, on August 6, 2021, Judge Alvin K. Hellerstein, U.S.D.J, ordered O'Neill and ONP to deposit the full amount of the Escrow Funds with the Clerk of Court and interplead all relevant claimants by noon, August 11, 2021.  A true and correct copy of the August 6 Order is attached hereto as **Exhibit 11**.

30.     O'Neill failed to comply with the Court's clear Order and directives on or before August 11, 2021.   Despite this, O'Neill and ONP represented their agreement to the Court and agreed to deposit $5,071,541.00 into the Disputed Ownership Fund ("DOF") through filing a Motion to Deposit Sum of Money.  The Court issued granted ONP's motion and rendered its Order, dated August 13, 2021.   A true and correct copy of the August 13 Order is attached as **Exhibit 12**.

31.     In response to the August 13 Order, counsel for Medequa wrote to the Court and requested an amendment of the Order.  The letter highlighted that the Court's previous Order required the full deposit of the Escrow Funds, including the subtracted balance of $28,459.00. The letter disputed that O'Neill incurred $28,459.00 in costs and fees related to any service as an Escrow Agent and highlighted for the Court that O'Neill never provided documentary evidence to support his contentions.  Further, pursuant to the Escrow Agreement, any compensation or reimbursement to the O'Neill shall be split evenly between the Buyer and Seller – which SonerMed never received any invoices to the date of the letter.  Accordingly, counsel for Medequa requested the full amount of the Escrow Funds be so amended.  A true and correct copy of the letter is attached hereto as **Exhibit 13**.

32.     The Court granted Medequa's request on August 17, 2021, and ordered O'Neill and ONP deposit the full amount of $5,100,000.00.  In its decision, the Court noted that ONP's "claim for fees and costs, any other claims to the Escrow Funds, must be determined in the course of this

interpleader action, with the appropriate documentary proof presented and examined." A true and correct copy of the August 17 Memo Endorsement is attached hereto as **Exhibit 14**.

33.    O'Neill returned to the Court on August 23, 2021, with a letter requesting that the Court reconsider. Specifically, O'Neill cross-referenced the Escrow Agreement and pointed the Court to the terms contained in Paragraphs 5(c) and 5(g). Under the Escrow Agreement, O'Neill contended he was entitled to the incurred fees and expenses given his role as Escrow Agent because the express language entitled him to a "lien" on the Escrow Funds "to protect [ONP] against the very circumstances now present." A true and correct copy of this August 23 letter is attached hereto as **Exhibit 15**.

34.    Again, despite clear orders from the Court, O'Neill continued to employ deceptive tactics and intentionally misconstrue the unambiguous mandate under the Escrow Agreement to avoid payment and reimbursement of the Escrow Funds.

35.    The Court responded on August 25 and again required ONP to interplead "the entire amount it holds in escrow — $5,100,000.00 . . ." pursuant to its previous orders. Moreover, the Court highlighted O'Neill's full deposit could be the precondition for a proper motion to seek payment for ONP's alleged claims for a "first lien" under the Escrow Agreement, and that a proper affidavit and contemporary records accompany such motion for recovery. A true and correct copy the Court's August 25 Memo Endorsement is attached hereto as **Exhibit 16**.

36.    In the coming days, O'Neill failed to deposit the entire amount of the Escrow Funds. As such, O'Neill unlawfully deprived Medequa of the Escrow Funds almost a year after it had issued the Cancellation Notice to O'Neill and ONP.

37.    The Court reiterated its August 25 Order requiring O'Neill and ONP interplead the full amount of the Escrow Funds on September 15, 2021. Furthermore, the Court demanded

compliance by Noon on September 21.  A true and correct copy of the September 15 Order is attached hereto as **Exhibit 17**.

38.     O'Neill completed an incomplete deposit of $3,300,000.00, which the Clerk of Court entered on September 22, 2021.

**Defendant's Repeated Assurances to Plaintiff Despite Falsity**

39.     After Medequa issued the Cancellation Notice to O'Neill, he falsely misrepresented by email on December 7, 2020, that he could not release the Escrow Funds given "irregularities and inconsistent documentation," and he demanded "due diligence" measures before honoring Medequa's rightful request under the Escrow Agreement.  *Supra* ¶¶ 17-18, Ex. 5.

40.     O'Neill's incomplete deposit of only $3,300,000.00 of the Escrow Funds into the Court's registry implicitly revealed what he concealed for nearly a year – O'Neill dissipated the Escrow Funds by his withdrawal from the TD Bank account ending in 4107 in August 2020.  Yet, O'Neill repeatedly and falsely assured to Medequa that the Escrow Funds remained untouched and fully under his possession, control, and dominion.  As the TD Bank account statements revealed, however, the Escrow Funds were almost immediately transferred outside the "segregated" Escrow Account that same month.  *Supra* ¶ 20, Ex. 6.

41.     Nonetheless, O'Neill baselessly demanded that Medequa provide (i) a list of attempted and failed procurement transactions by SonerMed; (ii) the name and contact information of a purported "U.S. Government Liason [sic]," which never existed; and (iii) the name of the Beneficial Owner of the Escrow Funds, together with identifying documents.  *Supra* ¶ 22-24, Ex. 8.

42.     Further, despite knowing his "due diligence" demands lacked any contractual bases or independent authority, O'Neill rejected Medequa's additional attempt to recover and return the Escrow Funds on December 11, 2020.  *Id.*

43.     Even so, O'Neill – who by then had already dissipated the Escrow Funds – claimed he was acting "pursuant to our fiduciary duty to protect the integrity of the transaction and investigate potential malfeasance and fraud that may have caused the irregularities . . . ."  *Id.*

44.     Continuing his deceit, O'Neill repeatedly represented to Medequa – both explicitly and implicitly – that the Escrow Funds remained under his possession, control, and dominion after Medequa sent a final written demand to him on December 17, 2020, ordering the return of the Escrow Funds.  *Supra* ¶ 25, Ex. 9.

45.     In line with O'Neill's fabricated tales of deceit, O'Neill offered several explanations regarding the incomplete deposit in his September 23, 2021 Declaration.  A true and accurate copy of his Declaration is attached hereto as **Exhibit 18**.

46.     O'Neill's fanciful tales to the Court for not returning the Escrow Funds would continue for weeks.  This time, O'Neill deployed his lies and manipulation before not just Medequa, but to the Court to conceal that O'Neill had already dissipated Escrow Funds in the Escrow Account ending in 4107 almost a year earlier.  *Supra* ¶ 20, Ex. 6.

47.     Under penalties of perjury, O'Neill represented (i) "*I still have control of the* $1.8 million of the subject [Escrow Funds] remaining to be deposited . . .," and (ii) "[] throughout the course of my serving as Escrow Agent for the subject transaction during 2020 and 2021 . . . representations have been made to me on multiple occasions, by persons or parties whom I have my reference to in my discussions with the Federal Bureau of Investigation, regarding *the ability*

*of third parties to access the Escrow Funds against my will*." Ex. 18, at p. 1, ¶¶ 1-2 (emphasis added). Both representations were never true and amounted to no more than mere fiction.

48.    O'Neill added (i) "[t]hese representations caused me to take *preventative measures to better safeguard the funds*, which preventative measures now make ready access to the remain $1.8 million of the Escrow Funds more difficult, requiring additional time in order be [sic] able to initiate a new wire transfer . . .," and he falsely represented, (ii) "[i]n light of these conditions . . . I expect to be able to provide a 'snapshot' of remaining [sic] $1.8 million balance of the Escrow Funds and begin initiating additional wire transfers for interpleader deposit during the next three (3) days business days," despite knowing that none of these representations were true. Ex. 18, at pp. 1-2, ¶¶ 3-4 (emphasis added). To little surprise, these empty promises never materialized because the Escrow Funds were long gone and Medequa had no independent means to verify this fact because it was peculiarly within O'Neill knowledge that he depleted the Escrow Funds. *Supra* ¶ 20, Ex. 6.

49.    Moreover, O'Neill deliberately misrepresented "[s]ince the time that I received the Escrow Funds in August 2020, there has not been any increase or addition to the Escrow Funds," whose deliberate word choice obfuscated the simple fact the Escrow Funds had decreased or depleted. Ex. 18, at p. 2, ¶ 5.

50.    O'Neill again did not deposit the remaining balance of the Escrow Funds during the next three business days. O'Neill knew he no longer possessed the Escrow Funds in the Escrow Account ending in 4107 – which lacked the sufficient funds for transfer into Court's registry – yet O'Neill continued to lie to the Court and Medequa.

51.    Rather, on October 1, 2021, O'Neill filed another sworn declaration claiming (i) "[a]s of today, *I still have control of the $1.8 million* of the subject [Escrow Funds] . . ." and (ii)

that on "[] Monday, October 4, 2021, I expect to be able to show the full balance of $1.8 million

. . . and expect to begin initiating additional by wire to the Court's registry." A true and accurate

copy of O'Neill's October 1 Declaration is attached hereto as **Exhibit 19** (emphasis added).

52.     O'Neill's deliberate and continued pattern of deceit and gamesmanship would

continue into his third sworn declaration on October 13, 2021. O'Neill deceptively represented

his failure to comply with the Court's orders was due to a series of "interrupted, "held up,"

"postponed," and "rescheduled" payments. A true and accurate copy of O'Neill's October 13

Declaration is attached hereto as **Exhibit 20**.[1]

53.     Additionally, O'Neill represented (i) that he expects "as many as four payment

transactions . . . to resulting receipt of funds sufficient to complete the remaining $1,800,000

interpleader deposit to this Court, (ii) that if he is "able to re-confirm, reschedule and receive

some or all of the additional payments which were postponed . . . I could foreseeably complete

the remainder of the interpleader deposit by October 18 . . .," or (iii) if he proves unable to "re-

confirm and reschedule any of other postponed payments . . . the first in a series of weekly

payments . . . will enable me to continue wiring funds to the Court's deposit registry next week

and in each succeeding week thereafter, such that I would be able to complete the remaining

interpleader deposit by Friday, November 19, 2021 . . ." Ex. 20, at pp. 1-2, ¶¶ 2-5.

54.     O'Neill noted that his inability to "reconfirm[], reschedul[e], and receiv[e] these

will payments" will lead to the incompletion of interpleader deposit Order "because some or all

---

[1] O'Neill informed Judge Hellerstein, U.S.D.J., that he could not deposit the full balance of the Escrow Funds with the Clerk of Court because he received threat to himself and his family. A true and accurate copy of the Sentencing Transcript is attached as **Exhibit 33**. The Federal Bureau of Investigation (the "FBI") investigated these representations and found no objective evidence of any threats to Mr. O'Neill or his family at that time. *Id.*, at pp. 16-17. Attorneys for the Government noted that the even if such threats proved credible, the Escrow Funds "had long been transferred and was gone." *Id.*, at p. 17; *see also* Ex. 6.

of the above referenced transactions will be postponed indefinitely  and/or canceled in my absence." *Id.* at p. 2, ¶ 6.

55.    These false representations ultimately proved to be attempts to give O'Neill additional time given the United States Government and law enforcement had already begun to unravel his fraudulent scheme.  *Infra* ¶¶ 67-75.

**Plaintiff's Reliance on Defendant's Intentional, False Misrepresentations and Deception Caused Financial Loss**

56.    Almost a year after O'Neill failed to honor the terms of the Escrow Agreement and rightfully reimburse Medequa of the Escrow Funds, Medequa moved for summary judgment (the "Motion") on November 11, 2021.  A true and accurate copy of Medequa's summary judgment motion is attached hereto as **Exhibit 21**.

57.    The Motion referenced the underlying Escrow Agreement and underscored the limited circumstances for the disbursement of the Escrow Funds, in accordance with joint instructions of Medequa and SonerMed, or Medequa's service of a Cancellation Notice based on SonerMed's failure to deliver.  Under the Escrow Agreement, the terms were clear about the intent about the parties' anticipated bargain.

58.    The Motion detailed the extensive procedural history regarding O'Neill failure to reimburse Medequa pursuant to the clear and ambiguous express language of the Escrow Agreement and O'Neill brazen defiance in complying with multiple Court orders to place the Escrow Funds in the Court's deposit registry.

59.    The Court rendered its decision on July 25, 2022, finding that O'Neill breached the Escrow Agreement, and thus, partially granting Medequa's Motion.  A true and accurate copy is attached hereto as **Exhibit 22**.

60.    Specifically, the Court underscored that (i) the language contained in Section 4 of the Escrow Agreement made unambiguously clear to all contracting parties – whose relationships were clearly delineated, including O'Neill's role as Escrow Agent – about the procedure of reimbursing and releasing the Escrow Funds, which O'Neill failed to comply with such terms, and (ii) O'Neill breached the Escrow Agreement's unambiguous terms through his unauthorized transfer of the Escrow Funds outside the Escrow Account.  *Id.* at pp. 6-10.

61.    The Court did not find O'Neill misrepresentations regarding his farcical explanations of taking "preventative measures" to be compelling or persuasive.  In fact, the Court even noted that given Medequa's and O'Neill's relationship under the Escrow Agreement, "[t]he only other explanation is that [O'Neill] made an unauthorized transfer of at least $1.8 million, or appropriated that amount to [his] own use, in breach of the Escrow Agreement.  That is sufficient for [Medequa] to prove its claim for breach of contract."  *Id.* at pp. 10-11.

62.    On August 10, 2022, the Court amended its Order granting summary judgment and awarded Medequa $5,100,000.00 plus interest from the date of judgment.  A true and accurate copy of the Court's August 10, 2022 Amended Order is attached hereto as **Exhibit 23**.

63.    On August 11, 2022, judgment was entered for Medequa in the amount of $5,100,000.00, plus interest from the date of judgment, and tax costs.  A true and accurate copy of the Court's August 11, 2022 entered judgment is attached hereto as **Exhibit 24**.

64.    On August 30, 2022, the Court amended its judgment and granted Medequa $5,100,000.00, plus costs and interest from the date of breach, November 23, 2020, at the statutory rate of 9% per year.  A true and accurate copy of the Court's August 30, 2022 Order, amending judgment is attached hereto as **Exhibit 25**.

65.    The same date, on August 30, 2022, an amended judgment was entered for Medequa in the amount of $5,100,000.00, plus interest from the date of breach, November 23, 2020, to the date of judgment at the statutory rate of 9% per year, and tax costs, amounting to $5,887,216.44.  A true and accurate copy of the Court's August 30, 2022 amended and entered judgment is attached hereto as **Exhibit 26**.

66.    By May 16, 2024, ONP partially satisfied the amended judgment by paying $2,075,095.12 to Medequa, by virtue of the Court releasing a significant portion of funds held in escrow by the Clerk of Court from the September 22, 2021 deposit with the Court.   A true and accurate copy of the Partial Satisfaction of Judgment, dated May 16, 2024, noting previous payment is attached hereto as **Exhibit 27**.

**Defendant's Parallel Criminal Proceedings Disentangle His Fraud**

67.    Contemporaneous with the motion practice in Medequa's civil action, criminal proceedings against O'Neill individually commenced.  The United States Attorney's Office charged O'Neill with two counts of wire fraud, false statements, and perjury – all intertwined with his handling of Medequa's Escrow Funds. A true and correct copy is attached hereto as **Exhibit 28**.

68.    On January 26, 2022, a grand jury formally indicted O'Neill.  The indictment, *inter alia*, charged O'Neill with devising and orchestrating a fraudulent scheme to obtain and transfer money and property by means of false and fraudulent pretenses, representations, and promises from at least August 2020 up to and including December 3, 2021.  A true and correct copy is attached as **Exhibit 29**.   Additionally, the indictment highlighted O'Neill in his October 1 declaration made a knowingly false material declaration as to his possession, control, and dominion of the Escrow Funds at the time.  *Id.*; *supra* ¶ 51, Ex. 19.

69.     O'Neill willingly pled guilty to his fraudulent scheme and admitted to the wire fraud against Medequa on November 15, 2022.  A true and accurate copy of O'Neill's guilty plea transcript is attached hereto as **Exhibit 30**.

70.     Specifically, O'Neill admitted under oath to (i) orchestrating and making unauthorized transfers of the Escrow Funds out of the Escrow Account; (ii) misrepresenting the status and liquidity of the Escrow Funds and fabricating lies to bid him additional time; and (iii) and misappropriating the Escrow Funds by spending the money for his personal gain.  *Id.,* at pp. 20-25.

71.     O'Neill also highlighted to the Court that he is an attorney by education and trade, barred in Maryland and Washington, District of Columbia, where he "assist[ed] clients engaged in business transactions."  *Id.*, at pp. 20-21.  Related to his practice, O'Neill admitted to causing $5.1 million to be wired from his attorney escrow account ending in 4107, from August 2020 to December 2020, related to the business transaction between Medequa and SonerMed.  *Id.*, at p. 21.  After the deal collapsed and Medequa requested the Escrow Funds, O'Neill continued by admitting, "I wired the [Escrow Funds] out of my account.  I did this to *avoid returning the money* to the third party . . . [a]t that the time *the money was no longer in my account*.  I *intentionally* removed the [Escrow Funds] from my account to avoid returning the money to [Medequa] as they had requested.  *Id.* (emphasis added); *supra* ¶ 20, Ex. 6.

72.     Further, as to the false statements made to Medequa, O'Neill admitted that "I went through a process where I tried to validate who the parties were under the *guise* that I still had the money, and *I did not have the money still in the* [4107] *account*."  Ex. 30, at p. 23 (emphasis added).  O'Neill further agreed that he lied to Medequa about whether he still had the money after he had transferred the Escrow Funds to a different account.  *Id*., at pp. 23-25.

73.    The Court accepted O'Neill's guilty plea to the two counts of wire fraud charged against him. *Id.*, at pp. 29-30.

74.    On May 17, 2023, the Criminal Judgment was entered against O'Neill for two counts of wire fraud in violation of 18 U.S.C. § 1343, and O'Neill was sentenced to nine years in prison and three years of concurrent supervised release at a facility close to his family in the State of Maryland.  A true and correct copy of the Criminal Judgement is attached as **Exhibit 31**.

75.    The same day, the Order of Restitution was entered against O'Neill and was ordered to pay $9,397,545.01 in restitution to his victims.  A true and correct copy of the Order of Restitution is attached hereto as **Exhibit 32**.

## FIRST CAUSE OF ACTION
### (COMMON LAW FRAUD AGAINST BRIAN O'NEILL)

76.    Medequa repleads and realleges the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

77.    From at least on or about August 2020, Brian O'Neill voluntarily and intentionally devised and executed a scheme to defraud Medequa out of $5,100,000.00, purporting to safeguard the Escrow Funds in a distinct and segregated Escrow Account, as Medequa's Escrow Agent.

78.    In furtherance of his scheme, O'Neill manipulated the language of the Escrow Agreement to conceal his fraudulent intentions and justify his refusal to release the Escrow Funds. He repeatedly made false statements to Medequa, including assertions of purported authority to take "preventative measures" in response to alleged "irregularities and inconsistent documentation" that supposedly required "due diligence," which O'Neill knew lacked any basis and were intended to conceal that he transferred the Escrow Funds.

79.    O'Neill explicitly and implicitly represented the Escrow Funds remained segregated and whole, despite knowing the falsity of his misrepresentations.

80.    O'Neill went so far as acting under his fiduciary duty to baselessly request "due diligence" materials and supporting documentations to deceptively conceal his fraud.

81.    Further, O'Neill made these representations to Medequa so that Plaintiff would not raise any alarms regarding his unauthorized transfer of funds for his fraudulent scheme.

82.    Likewise, given that O'Neill pled guilty and admitted on the record in his parallel criminal proceeding that he knew his conduct was fraudulent, he possessed the requisite intent to deceive and induce Medequa as part of his fraudulent scheme

83.    O'Neill's statements were material because Medequa relied on O'Neill as an Escrow Agent committed to discharging his professional and ethical duties.   O'Neill further held himself out as an attorney in the business of helping client facilitate business transactions at the time.   Additionally, O'Neill's statements were material to Medequa's continued reliance on him to carry out his obligations as Escrow Agent, to advise on the status of the liquidity of the Escrow Account, and to advise on the availability and transfer of the Escrow Funds given O'Neill's receipt of the Cancellation Notice on November 22, 2020.

84.    Medequa justifiably relied upon O'Neill's false statements and representations by, among other things, depositing funds into Defendant's attorney escrow account and not taking alternate or additional measures to safeguard the funds being held in escrow for Medequa by O'Neill because his practice including holding client funds for business transactions.

85.    Medequa further relied on subsequent false communications from O'Neill that the requested funds remained in escrow and that O'Neill possessed such funds but only needed to

perform "due diligence" (a concept found nowhere in the Escrow Agreement) to release those funds back to Medequa after the transaction was cancelled.

86.    O'Neill made these material statements over several communications with Medequa with the intent to deceive and to conceal that he had dissipated the Escrow Funds.  In the same month that O'Neill received the Escrow Funds into his "segregated" TD Bank attorney escrow account, he would also withdrawal the Escrow Funds.  As bank statements of the Escrow Account ending in 4107 later revealed, O'Neill completed the unauthorized transfer and removal of the Escrow Funds outside the Escrow Account almost immediately.

87.    O'Neill knew his statements in various correspondence in 2020 to Medequa were false during this time given he dissipated the Escrow Funds, yet he continued to repeat similar statements to the Court to conceal and forestall the inevitable conclusion – the unravelling of his fraudulent scheme of transferring the Escrow Funds to fund his own business opportunities and personal ventures.

88.    Medequa justifiably relied on O'Neill's knowingly material and false representations because Medequa had no knowledge of the falsity and had no reason to know or suspect that the representations were false – especially coming from Plaintiff's Escrow Agent, and a licensed attorney.

89.    As a result of Defendant's material falsehoods and his intent to deceive, and Medequa's justifiable reliance on O'Neill given the Escrow Agreement and his continued statements, Medequa sustained pecuniary losses of $5,100,000.00, plus interest thereon to the date of entry of judgment and from the date of judgment, plus attorneys' fees and costs, and exemplary damages.

## SECOND CAUSE OF ACTION
### (FRAUDULENT INDUCEMENT)

90.     Medequa repleads and realleges the allegations contained the preceding paragraphs of the Complaint as if fully set forth herein.

91.     O'Neill misrepresented his intent to execute and discharge his fiduciary duties as Plaintiff's Escrow Agent because O'Neill never actually intended to safeguard his client's Escrow Funds as demonstrated by his transfer of Escrow Funds outside of this Escrow Account shortly after receiving them.  In fact, during the same period that the Escrow Funds were deposited in approximately August 2020, Defendant withdrew the Escrow Funds without authorization from Plaintiff despite acting as Plaintiff's Escrow Agent.

92.     O'Neill continued his misrepresentations to Medequa that the Escrow Funds remained in the Escrow Account for months despite his intent to never safeguard the Escrow Funds.

93.     Specifically, upon the receipt of the Cancellation Notice on November 22, 2020, O'Neill knew he had dissipated the Escrow Funds.  Medequa could not independently verify whether the Escrow Funds remained within a segregated Escrow Account, and was left to only rely on the statements of its Escrow Agent, Brian O'Neill.

94.     As a pretext to his knowledge that the Escrow Funds had left the Escrow Account ending in 4107 months earlier, O'Neill baselessly refused Medequa's attempts to recover the Escrow Funds by noting "irregularities and inconsistent documentation" and that he needed to undertake additional "due diligence."

95.     O'Neill made these repeated misrepresentations and implicit promises to return the Escrow Funds to Medequa over several months by December 2020 to forestall the uncovering of

his fraudulent scheme.  O'Neill would go as far as characterizing Medequa's demands as "materially deficient" to refuse the release of the Escrow Funds.

96.    Defendant's representations that he would execute and discharge his obligations as Defendant's Escrow Agent were materially false and misleading because Medequa entrusted O'Neill, who held himself out as an attorney, as an Escrow Agent to facilitate the underlying transaction with the utmost professional and ethical standards.

97.    Defendant's representations about safeguarding and discharging his Escrow Agent duties were distinct from Defendant's obligations under the Escrow Agreement because Defendant knew or a had a reason to know that Medequa would rely on his misrepresentations when Defendant agreed to safeguard the Escrow Funds, acted under the formalities as an Escrow Agent, represented his use of a segregated attorney Escrow Account, and held himself out has an Escrow agent and attorney.

98.    Defendant had no intention of honoring his false promises or acting in accordance with professional or fiduciary responsibilities as an escrow agent as he represented to Medequa because as bank records would later indicate, the unauthorized transfer and withdrawal of the Escrow Funds came almost immediately after Medequa's deposit of the Escrow Funds into the Escrow Account ending in 4107.

99.    Plaintiff had no reason to doubt the initial truthfulness of Defendant's intentions as Escrow Agent, and thus, Plaintiff's reliance on O'Neill was justified.

100.    Defendant offered false representations to Medequa, including false statements about his purported authority under the Escrow Agreement to refuse Medequa's requests, and the liquidity and availability of the Escrow Funds, and Medequa could not independently verify the

veracity of Defendant's representations because the Escrow Account was not within Plaintiff's control or knowledge.

101.   Plaintiff was fraudulently induced to enter into the Escrow Agreement due to Defendant's misrepresentations of his intent to serve as Escrow Agent for the transaction, and as a result of which Medequa was damaged in an amount no less than $5,100,000.00, plus interest thereon to the date of entry of judgment and from the date of judgment, plus attorneys' fees and costs, and exemplary damages.

**THIRD CAUSE OF ACTION**
**(BREACH OF FIDUCIARY DUTY)**

102.   Medequa repleads and realleges the allegations contained in preceding paragraphs of the Complaint as if fully set forth herein.

103.   In addition to the terms of the Escrow Agreement, O'Neill had an independent statutory duty/rule-based duty under the Rules of Professional Conduct in the effect at the time including, but not limited to, his role acting as Escrow Agent.  Under Rule 1.15 (22 N.Y.C.R.R. § 1200.0), Defendant was to preserve and safeguard the Escrow Funds for Medequa in a segregated account and/or in escrow for Medequa, and also promptly pay and deliver to Escrow Funds to Medequa given Medequa was entitled to the Escrow Funds, and accordingly, Defendant was a fiduciary of Medequa and owed a fiduciary duty to Medequa to exercise his responsibilities with scrupulous good faith.

104.   In addition, under Rule 8.4, an attorney is barred from knowingly assisting or inducing others into an act or illegal act involving dishonesty, fraud, deceit, or misrepresentation, and as Defendant's deliberate misrepresentations and failure to faithfully act as an Escrow Agent demonstrate, Defendant blatantly breached his fiduciary duties to Medequa.

105.    O'Neill breached his fiduciary duties owed to Medequa by releasing Medequa's Escrow Funds, which Defendant held in escrow for Medequa, to various third parties, without authorization, good cause or justification, and for O'Neill's own personal and financial benefit.

106.    O'Neill acted deliberately and intentionally deceived Medequa through various communications in 2020 both explicitly and implicitly that the Escrow Funds remained intact and whole despite his unauthorized transfers.  The fraudulent scheme lay at the heart of his breach – and not purely incidental or duplicative – of O'Neill's fiduciary duty because Medequa entrusted O'Neill for the sole purpose and benefit of safeguarding the Escrow Funds as part of the transaction, and but-for Defendant's role as Escrow Agent, his fraud and breach of fiduciary duty would not have occurred.

107.    Likewise, upon Medequa's delivery of the Escrow Funds to O'Neill, and after Medequa's requests and subsequent demands to release the Escrow Funds, O'Neill thwarted his duty to strictly execute the terms of the Escrow Agreement as Escrow Agent and return the Escrow Funds.

108.    Accordingly, Defendant is liable for his breach of fiduciary duty as Escrow Agent.

109.    As set forth above, Medequa has been damaged as result of the foregoing and entitled to damages in an amount of $5,100,000.00, plus interest thereon to the date of entry of judgment and from the date of judgment, plus attorneys' fees and costs, and exemplary damages.

## FOURTH CAUSE OF ACTION
## (FRAUDULENT CONCEALMENT)

110.    Medequa repleads and realleges the allegations contained in preceding paragraphs of the Complaint as if fully set forth herein.

111.    O'Neill fraudulently concealed – beginning in or about August 2020 and continuing through at least late 2021 – materials facts concerning the status, availability, and liquidity of Medequa's Escrow Funds.

112.    O'Neill had a duty to disclosure complete and accurate information about the status of the Escrow Funds to Medequa because O'Neill owned a fiduciary duty to Medequa. Specifically, O'Neill acted as the Escrow Agent for the underlying transaction and held himself out as an attorney to Medequa.  Defendant, alone, possessed the peculiar knowledge that he dissipated the Escrow Funds within the same month of its deposit into the Escrow Account ending in 4107, and that he never intended to discharge his Escrow Agent duties faithfully.

113.    Medequa could not have discovered independently that the Escrow Funds had been depleted by the time Medequa requested the Escrow Funds with the Cancellation Notice in November 2020.

114.    O'Neill had a duty to disclose complete and accurate information about the status of the Escrow Funds to Medequa.  Instead, O'Neill affirmatively concealed this information and attempted to thwart the discovery of his fraud by falsely claiming "irregularities and inconsistent documentation" and demanding "due diligence" over correspondence as a pretext to avoid returning the Escrow Funds.

115.    By December 2020, O'Neill knowingly concealed that the true reason for his refusal to return the Escrow Funds to Medequa was that the Escrow Funds were no longer present in the Escrow Account ending in 4107, and O'Neill alone would have control over this information, yet he continued to represent explicitly and implicitly that the Escrow Funds remained in his sole possession.

116.    O'Neill knew the status of the Escrow Funds was material information that Medequa required.  Accordingly, O'Neill concealed the fact that the Escrow Funds were no longer available to deceive Medequa into believing he would return Medequa's Escrow Funds.

117.    Medequa relied on O'Neill's false misrepresentations and omissions because Medequa had no independent means to investigate or verify O'Neill's statements about the status of the Escrow Funds.

118.    Medequa's reliance on Defendant's false misrepresentations and omissions was both reasonable and justifiable because O'Neill was Medequa's Escrow Agent, and he held himself out as a trusted attorney.

119.    As a direct and proximate result of Medequa's reliance on O'Neill, Medequa was damaged by sustaining monetary losses of at least $5,100,000.00, plus interest thereon to the date of entry of judgment and from the date of judgment, plus attorneys' fees and costs, and exemplary damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against Defendant, as follows:

1.     For damages in excess of the amount of $5,100,000.00 and all of Plaintiff's attorneys' fees incurred in bringing this action against Defendant Brian O'Neill less any credit from the partial satisfaction;

2.     Plaintiff's costs and disbursements incurred herein;

3.     Pre-judgment interest running from the date of breach, at the rate of 9% per year;

4.     Post-judgment interest at the rate 9% per year;

5.     Attorney's costs and fees;

6.     Punitive damages against Defendant Brian O'Neill in the amount of $10,000,000.00; and

7.     Such further relief as the Court deems just and equitable.

Dated: January 27, 2026          **CONDON & FORSYTH LLP**
      New York, New York

                                   /s/        *Joseph E. Czerniawski*
                                   Joseph E. Czerniawski, Esq.
                                   James J. Burke, Esq.
                                   7 Times Square, 18th Floor
                                   New York, New York 10036
                                   (212) 894-6700

                                   *Attorneys for Plaintiff Medequa LLC*